NATURAL RESOURCES DEFENSE
COUNCIL, INC., et al.,
Plaintiffs-Appellees,

v.

Howard D. ZELLER, et al.,
Defendants-Appellants,

Project Management Corporation, et al.,
Intervenors-Appellants.

No. 82–8570.

United States Court of Appeals,
Eleventh Circuit.

Sept. 21, 1982.

Rehearing Denied Oct. 29, 1982.

Jacques B. Gelin, Dept. of Justice, Washington, D.C., for Zeller, et al.

G. Lee Garrett, Jr., Atlanta, Ga. and George L. Edgar, Washington, D.C., for Project Management Corp.

Lee L. Bishop, Washington, D.C., for Natural Resources Defense Council, Inc.

Before RONEY, FAY and VANCE, Circuit Judges.

PER CURIAM:

At defendants' request, we expedited this appeal from a preliminary injunction issued by the district court on September 3, 1982, which enjoined any site preparation activities relating to the Clinch River Breeder Reactor Plant, a multi-billion dollar federal nuclear energy project authorized by Congress. After considering the briefs, the record and oral argument, we reverse the grant of the preliminary injunction on essentially two grounds. *First,* the findings of fact and conclusions of law are insufficient to justify the issuance of an injunction. *Second,* if the district court adopted plaintiffs' interpretation of the law, it erred as a matter of law in holding invalid on this record an agreement which permitted the commencement of site preparation prior to the issuance of a final environmental impact statement and a permit under the National Pollution Discharge Elimination System.

On August 23, 1982, the Natural Resources Defense Council, Inc. (NRDC), the Sierra Club, and two named individuals, brought suit in the United States District Court for the Northern District of Georgia against the Environmental Protection Agency (EPA), the Department of Energy (DOE), and DOE's Clinch River Breeder Reactor Plant (CRBRP) Project, and named officials. The complaint sought a declaratory judgment that EPA violated the National Environmental Policy Act (NEPA), 42 U.S.C.A. § 4321 *et seq.,* the Clean Water Act (CWA), 33 U.S.C.A. § 1251 *et seq.,* and its own regulations in allowing site preparation to commence at the CRBRP prior to completion of the final environmental impact statement (EIS) and issuance of a permit to discharge pollutants. Plaintiffs also sought a preliminary injunction restraining site preparation pending a hearing on the merits.

Defendants filed responsive pleadings on September 1, 1982, and the district court held a hearing on September 2, 1982. Upon consideration of oral argument and the parties' written submissions, the court on September 3 held that EPA had violated NEPA and its own regulations and entered a short order granting plaintiffs all relief that they requested.[1]

Notice of appeal was filed on September 7. A motion to expedite was granted on representation that the injunctive delay would add approximately 4.5 million dollars or more to the cost of the project. This Court heard oral argument of the appeal after full briefing on September 15. Although this Court has carefully considered all arguments of the parties and has decided that the injunction was improperly granted, time constraints prohibit an exhaustive opinion. A sketchy recitation of the facts, based largely on the briefs of the parties, and the premises of this decision are herein set forth.

The Clinch River Breeder Reactor Plant (CRBRP) is an element of the Liquid Metal Fast Breeder Reactor (LMFBR) Program begun by the federal government with the objective of developing the technology and demonstrating the commercial viability of LMFBRs as the next generation of nuclear power plants. This multi-billion dollar program consists of LMFBR research, fuel processing, and LMFBR commercial demonstration through construction and operation of the CRBRP, then a full-sized Large De-velopment Plant. A fundamental objective of the LMFBR program in general, and the CRBRP in particular, is the demonstration of the licensability of LMFBRs in the conventional utility environment.

The operation of LMFBRs differs substantially from conventional nuclear power plants. The nuclear reactors in use today for the commercial generation of electricity are, with only one exception, "light-water" reactors ("LWR"). LWRs are fueled by uranium, and the extremely hot fissioning core is cooled by water. In contrast, LMFBRs are fueled with plutonium and cooled with volatile sodium. The process of "breeding" occurs when neutrons released from the plutonium core transform a surrounding blanket of Uranium-238 into Plutonium-239. The benefit of "breeders" is that over the course of their lifetime they can produce more PU–239 than they consume.

In 1970, Congress first authorized the design, construction, and operation of the CRBRP as the nation's first LMFBR demonstration plant. Pub. L. No. 91–273, 91st Cong., 1st Sess. A 1972 Environmental Impact Statement for the LMFBR Demonstration Plant (AEC–WASH–1509) projected that the first demonstration plant would be completed by 1980. A 1975 EIS revised that schedule, projecting that the CRBRP would be operational by 1983, with commercial deployment of LMFBRs beginning in 1987. By the year 2000, the 1975 EIS

---

1. ORDER

Plaintiffs' Motion for Preliminary Injunction came before this Court for hearing on September 2, 1982. Upon due consideration of the memoranda of the parties and the arguments of counsel in open court, this Court finds that:

1. This Court has jurisdiction over the matters at issue; and

2. The August 5, 1982 Agreement between defendant EPA and defendant DOE violates EPA regulations; and

3. The August 5, 1982 Agreement between defendant EPA and defendant DOE violates the requirements of the National Environmental Policy Act; and

4. Plaintiffs have a substantial probability of success on the merits; and

5. Plaintiffs will suffer irreparable harm if the preliminary injunction is not issued; and

6. On balance, the threat and harm to plaintiffs outweighs any harm to defendants; and

7. The public interest is not disserved by granting a preliminary injunction;

It is hereby *ordered* that plaintiffs' Motion for Preliminary Injunction is granted, and that defendants are enjoined from any site preparation activities relating to the Clinch River Breeder Reactor until such time as a final environmental impact statement is completed and a NPDES permit is issued by EPA.

Sept. 3, 1982
Date

/s/ Marvin H. Shoob
Marvin H. Shoob
United States District Court
Judge

projected the LMFBRs would represent one-third of installed nuclear capacity in the U.S.

In April 1977, President Carter determined that CRBRP construction should be "indefinitely deferred." In 1981, the Reagan administration revived the LMFBR program. A new programmatic EIS released in 1982 projected completion of the CRBRP around 1990, with construction to begin in 1982 or early 1983.

The specific work which the defendant applicants seek to do now, and which was enjoined by the district court, involves the clearance of 292 acres of a 1,364-acre site, presently dedicated to industrial purposes and adjacent to the 37,000-acre Oak Ridge reservation. The site is located on a meander of the Clinch River, between two dams owned by TVA used for electric generation and other uses. The site is currently vegetated with second and third growth woods. The woods are part of a managed forest where the harvest of marketable timber occurs regularly.

The proposed site preparation activities which are anticipated to occur before EPA issues its National Pollution Discharge Elimination System (NPDES) permit include clearing the site of all marketable timber; site clearing and grading; installing sediment basins, catch ponds, and filters to prevent environmental degradation; excavation; building temporary construction-related facilities, improvements to an access road and preparing a site for a railroad spur; and constructing services, including power, water, sewerage, and fire protection.

Following the application in 1975 for a construction permit, the applicant requested the NRC's Atomic Safety and Licensing Board to issue a partial initial decision on environmental and site suitability issues and a limited work authorization to begin site preparation. Licensing proceedings were suspended in 1977, however, when the Carter administration terminated the project. By then, both programmatic and site-specific environmental impact statements for the CRBRP had been prepared. The 1977 site-specific EIS recommended the grant of a construction permit, finding that the environmental impact of site preparation activities would be insignificant.

In March 1981, the Reagan administration made the project a high-priority element in the national energy policy. Congress authorized 228 million dollars in funding. As a result, licensing proceedings before the Nuclear Regulatory Commission were reactivated. On July 1, 1982, the applicant requested NRC to allow preliminary site preparation activities to begin, pursuant to the provisions of 10 C.F.R. § 50.12 (1982), prior to the completion of ongoing environmental hearings in the Clinch River licensing proceedings before the Atomic Safety and Licensing Board. On August 5, after holding informal proceedings including oral hearings in which organizational plaintiffs and others took part, NRC voted to grant the request, concluding that it was in the public interest to do so. The Commission's decision did not authorize construction of the CRBRP, in whole or part. It authorized only preliminary site preparation activities.

In July 1982, the NRC staff decided to prepare a draft supplement to the 1977 site-specific EIS. This decision had the effect of delaying the final environmental review in NRC's adjudication hearings until issuance of the final supplement. Since time was now considered to be of the essence, the EPA and DOE entered into an agreement on August 5, 1982, pursuant to 40 C.F.R. § 122.66(c)(4)(i) (1981) (Appendix A). This agreement permitted the Project to commence the site preparation activities, but prohibited the Project from making any point source discharges of wastewater until such time as the Project obtained an NPDES permit as required by the Clean Water Act. The August 5 agreement limited the scope of work which could be performed and required the Project to abide by all EIS-related requirements as provided in the 1977 EIS and its draft supplement.

The validity of this August 5, 1982, agreement is at issue here. The district court, without stating any reasons, simply held that the agreement violates EPA regulations and the requirements of the National Environmental Policy Act. As we see it, that holding is the controlling issue on this appeal. If the agreement is valid, there is no legal base upon which the district court could posit injunctive relief. Neither the wisdom of the agreement nor of the project as a whole is subject to review by the federal court. The alleged harm to the plaintiffs, the issues as to the public interest and governmental policy, the possible cost to the government if the permit is ultimately either denied or conditioned upon the repair of work here contemplated, are all items of concern to the executive and legislative branches of government, but not to the judicial branch. If the defendant agencies are proceeding according to the law established by Congress and the regulations promulgated by the executive agencies, they are entitled to proceed without judicial interference. If the agreement is so authorized, they have done so.

The plaintiffs argue that the agreement violates the requirements of EPA regulations at 40 C.F.R. § 122.66(c)(4)(i) (1981) for two reasons: *first,* the agreement is not legally binding because the EPA cannot enforce the terms of the agreement against the DOE, and *second,* the regulation does not permit the agreement to be executed prior to the issuance of a final EIS.

The regulation provides:

(4)(i) No on-site construction of a new source for which an EIS is required shall commence before final Agency action in issuing a final permit incorporating appropriate EIS-related requirements, or before execution by the applicant of a legally-binding written agreement which requires compliance with all such requirements, unless such construction is determined by the Regional Administrator not to cause significant or irreversible adverse environmental impact. The provisions of any agreement entered into under this paragraph shall be incorporated as conditions of the NPDES permit when it is issued.

■ The first argument focuses on the requirement of a "legally-binding written agreement." The appellees' argument is based on an affidavit of a former EPA Assistant Administrator for Enforcement stating that during his tenure at EPA, the Department of Justice refused to take any legal action to enforce a permit or other Clean Water Act obligation against another federal agency. If the district court's decision that the agreement violates EPA regulations is based on a finding of fact, it would be clearly erroneous. Such an affidavit would be an insufficient basis on which to make a factual determination that EPA would not seek to enforce this agreement. If the decision is based on the law, we accept the argument of the federal appellants that the agreement is "legally-binding," within the concept of the regulation for at least three reasons. First, the agreement contains an effluent limitation and is judicially enforceable by citizens and states under Section 505(a) of the Clean Water Act, 33 U.S.C.A. § 1365(a). Second, the agreement is binding and can be enforced within the Executive Branch pursuant to Executive Order 12088, which establishes an arbitration mechanism in the Executive Branch. Third, EPA can redress any violation of the agreement simply by refusing to issue the NPDES permit. 40 C.F.R. § 122.66 (1981). Finally, there is no reason to believe that the parties will not view such an agreement, entered into in good faith, as binding, or that they would not comply fully with its terms. There is nothing to the contrary in the record.

■ The second argument—that an agreement cannot be executed until a final EIS has been issued—misreads the regulation. Appellees rely on the preamble to the regulation which recites that "expected environmental impacts studied in the environmental impact assessment should not be allowed to proceed until that assessment

has been concluded." 44 F'ed. Reg. 32,872 (1979). First, it is clear from the definition section of the regulation that "environmental impact assessment" is not synonymous with "environmental impact statement." In 1979, the applicable regulation provided:

(h) The term "environmental impact assessment" (EIA) means the report, prepared by the applicant for a NPDES permit to discharge as a new source, which identifies and analyzes the environmental impacts of applicant's proposed source and feasible alternatives as provided in § 6.908 of this Part ...

\*      \*      \*      \*      \*      \*

(m) The term "final environmental impact statement" means the document prepared by EPA or under EPA guidance which identifies and analyzes in detail the environmental impacts of a proposed EPA action and incorporates comments made on the draft EIS.

40 C.F.R. § 6.900 (1979).

Second, plaintiffs failed to quote the last sentence of the preamble which reads as follows:

It should be noted that subparagraph (c)(4) allows the Regional Administrator to approve construction prior to issuance of a permit or finding of no significant impact (i.e., a negative declaration) if he or she determines that such a finding will probably be made.

This preamble is in accord with the provision of the regulation that on-site construction may begin before final Agency action and before execution of an agreement if the Regional Administrator makes certain determinations. Since construction can commence before a final EIS without an agreement, upon the Regional Administrator's determination that the construction will not cause significant or irreversible adverse environmental impact, it is a reasonable interpretation of the regulation that construction can start with an agreement which requires compliance with what the Regional Administrator determines to be appropriate EIS-related requirements. An agency's interpretation of its own regulations is controlling if reasonable. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *McHenry v. Bond,* 668 F.2d 1185 (11th Cir. 1982).

▪   Assuming the agreement is binding and not invalid because executed prior to a final EIS, there seems to be no viable argument that the Regional Administrator did not do what was required of him in evaluating the preliminary documents prior to entering into the agreement. The plaintiffs offered no evidence to contradict the rather conclusory affidavits of the EPA Administrator and the project director. A reading of the agreement itself, a copy of which is attached to this opinion as Appendix A, reflects substantial consideration of the environmental impact of this work and incorporates specific EIS-related requirements.

The plaintiffs have failed to carry their burden of showing that the agreement was not executed in accordance with the regulations.

The argument that the agreement violates the National Environmental Policy Act essentially seems to be an attack on the validity of the regulation, regardless of how that argument might be couched. Appellees properly concede they could not attack the regulation in the district court. 33 U.S. C.A. § 1369(b)(1)(E). The regulation is now on review by the U.S. Court of Appeals for the D.C. Circuit. *Natural Resources Defense Council v. EPA,* 673 F.2d 392 (D.C. Cir. 1980). Plaintiffs' argument that NEPA prohibits any work prior to the issuance of a final environmental impact statement leads necessarily to invalidating the regulation, which the district court had no jurisdiction to do.

The decision of the district court is reversed. The preliminary injunction is dissolved. This opinion shall be issued in manuscript form and the mandate shall issue immediately.

REVERSED.

APPENDIX A

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION IV

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| | ) | |
| CLINCH RIVER BREEDER REACTOR PROJECT | ) | AGREEMENT |
| OAK RIDGE, TENNESSEE | ) | |
| | ) | |
| NPDES NO. TN0028801 | ) | |

In December, 1981, the United States Department of Energy (DOE) through its Clinch River Breeder Reactor Project Office (CRBRP) filed its application for a National Pollutant Discharge Elimination System ("NPDES") Permit for discharge of wastewater resulting from preliminary site work at the project site. The original application for the plant was submitted in 1977. Since that time the plans for the Project facilities have been revised. The Project had previously been determined by the United States Environmental Protection Agency (EPA) to constitute a new source within the meaning of Section 306 of the Clean Water Act (33 U.S.C. § 1316). Thereafter, a draft Environmental Statement was prepared by the United States Nuclear Regulatory Commission (NRC) as lead Federal Agency, with EPA cooperating, pursuant to the provisions of the National Environmental Policy Act of 1969 ("NEPA") (42 U.S.C. § 4321, et seq.). A Final Environmental Statement (FES) was published in February, 1977. NRC has reviewed the 1977 FES in light of current information including the June 1982 Site Preparation Activities Report. A draft supplement to the Environmental Statement (DSES) (which contains a draft NPDES permit) was made available on July 30, 1982. The final supplement is expected to be released in late October, 1982.

Based on the foregoing, in light of the Congressional directive for expeditious Project completion, and in accordance with the President's nuclear energy policy statement of October 8, 1981, CRBRP has asked EPA to allow certain limited site prepara-

tion activities prior to the expected date of issue of the NPDES permit.

Therefore, the CRBRP and EPA, Region IV, pursuant to the requirements of 40 C.F.R. § 122.66(c)(4)(i), do hereby agree:

1. That CRBRP may begin, as of the date of signing by EPA of this Agreement:

(a) Clearing and Grubbing—Areas to be cleared and grubbed will include those required for roads, railroads, temporary construction facilities, parking lots, main plant, cooling towers, switchyards, storage areas, onsite quarry, concrete batching and mixing plant and barge unloading facility.

(b) Earthwork—Earthwork will include excavation, backfill and grading for roads and railroads, concrete batching and mixing plant, parking lots, main plant, cooling towers, switchyards, storage areas, the temporary construction facilities and buildings and quarry operations.

(c) Temporary Construction Facilities—Temporary construction facilities will be prepared or constructed, as required, to accommodate management, craft labor and the use of equipment and material for a project of this magnitude. Services to be installed will include water, sewerage, telephones, power, fire protection and compressed air. A barge facility and dock for unloading heavy equipment will also be constructed during this period pursuant to the terms of a

permit issued by the U.S. Army Corps of Engineers under the authority of Section 404 of the Clean Water Act.

(d) Other · Construction Activities—A suitable access road to the Site will be constructed. A railroad spur from the existing railroad at DOE's Oak Ridge Gaseous Diffusion Plant will be extended to the plant site. A construction parking area will be prepared. Temporary roads will be built to provide access to the construction area from the permanent access road, the barge unloading facility, and the quarry.

The foregoing activities are described more specifically in Attachment A to this Agreement. (Attachment A comprises Chapter 3 of the "CRBRP Site Preparation Activities Report—June 1982")

2. That no point source discharge of wastewater, including runoff degraded by the activities described in paragraph 1 will be made to waters of the United States.

3. That no construction except those activities specifically described in Attachment A will be conducted in any area which constitutes waters of the United States.

4. That in consideration of EPA's agreement to allow commencement of these limited construction activities prior to issuance of NPDES permit number TN0028801, CRBRP agrees to, will abide by and will not challenge in any administrative or judicial forum, inclusion in NPDES Permit number TN0028801 of any of the following terms:

(a) The Erosion and Sediment Control Plan dated July 16, 1982, shall be implemented at the commencement of site preparation activities. Consecutive reports shall be submitted covering periods of six months each during the first year of construction. During subsequent years of construction, reports shall be submitted covering 12 month periods. The reports will be due within two months of the end of the reporting period with the first report due on February 28, 1983.

(b) A 25-foot buffer zone will be provided between the Clinch River and the site-prep-aration activities except in the following areas:

I. The railroad spur going underneath Highway 58, Gallaher Bridge at RR Station 31 + 00 (RM 14.0).

II. The 48-inch corrugated metal pipe for drainage underneath the railroad spur, RR Station 29 + 39 (RM 14.0).

III. The 36-inch corrugated metal pipe for drainage underneath the railroad spur, RR Station 50 + 00 (RM 14.25).

IV. The extension of the 6-foot concrete culvert underneath the railroad spur and access road, Rd. Station 1 + 84 (RM 14.5).

V. The 14-foot corrugated metal pipe underneath the railroad spur and access road, Rd. Station 5 + 35 (RM 14.6).

VI. Road and railroad embankment closer than 25 feet to the Clinch River between Rd. Station 5 + 35 and Rd. Station 19 + 50.

VII. The barge unloading facility (RM 14.75).

VIII. The water discharge outfall (RM 16.0).

IX. The water intake (RM 17.9).

X. The corrugated metal pipe for the quarry treatment pond discharge (RM 18.25).

XI. Where existing River Road and appurtenances are presently closer than 25 feet to the Clinch River.

(c) In the event that it is determined that treatment ponds are no longer functionally required, the following steps will be taken:

I. Reestablish natural drainage patterns, and

II. Restore the pond area to an acceptable state of natural vegetation.

(d) Permittee shall conduct studies to assure that thermal discharges will have minimal impact on striped bass (*Morone saxtilis*) during extended periods of zero flow as

described in Section 4.1.2 of the "Update to the CRBRP Alternative Siting Analysis Within the TVA Power Service Area" (dated May 28, 1982).

Permittee shall not start construction of the plant discharge structure prior to submittal of reports on these studies and receiving approval by the Director, Water Management Division to start such construction. Such studies and reports shall include (1) coordination with TVA studies on lethal temperatures for adult and juvenile striped bass, (2) statistical analysis of streamflow during the months of July through September, (3) reevaluation of the thermal plume dispersion, and if necessary, (4) a review of alternative diffuser designs and thermal modeling. In the event that the above studies fail to demonstrate that the CRBRP thermal discharge will have no significant impact on the striped bass thermal refuge, the NPDES permit shall be modified to impose more stringent thermal limitations on plant discharges.

(e) Permittee shall implement an approved preoperational non-radiological aquatic monitoring program to reestablish baseline data on water quality and biotic conditions in the Clinch River not less than two years prior to the scheduled date for fuel loading. Not less than six months prior to the scheduled date for implementation, the permittee shall submit to the Director, Water Management Division, EPA, Region IV, for review and approval, a detailed monitoring plan. Reports shall be submitted annually, not more than three months following completion of the reporting period with the

first report due 15 months after implementation of the program. The program shall continue for a period of not less than two years, unless mutually agreed to by EPA and CRBRP.

(f) Permittee shall implement an approved operational non-radiological aquatic monitoring program on the first day of operation. Not less than six months prior to scheduled implementation date, the permittee shall submit to the Director, Water Management Division, EPA, Region IV, for review and approval, a detailed monitoring plan. Reports shall be submitted annually, not more than three months following completion of the reporting period with the first report due 15 months after implementation of the program. The program shall continue for a period of not less than two years, unless mutually agreed to by EPA and CRBRP.

(g) Effluent limitations and monitoring requirements:

During the period beginning on start of discharge and lasting through expiration the permittee is authorized to discharge from outfall(s) serial number(s) 003 through 008—Point source runoff from areas of construction and yard drainage to unnamed ditches to the Clinch River. (003, 004 and 008 may also receive dewatering waste and/or other small sources and 007 may also receive overflow from the Concrete Wash Settling Pond and the Aggregate Washing Settling Pond during abnormal rainfall periods.)

Such discharges shall be limited and monitored by the permittee as specified below:

| Effluent Characteristics | Discharge Limitations | Monitoring Requirements | |
|---|---|---|---|
| | Instantaneous Maximum | Measurement Frequency | Sample Type |
| Flow-m$^3$/ Day (MGD) | N/A | 1/week [1] | Grab |
| Total Suspended Solids (mg/1) | [2] | 1/week [1], [3] | Grab |
| Oil and Grease (mg/1) [5] | 5 [5] | 1/week [1], [5] | Grab [5] |
| Detention Volume | See Below | 1/six months | Calculation(s) |

The runoff treatment ponds shall be capable of processing the 10-year, 24-hour rainfall event plus all accumulated silt without overflow of the standpipe. Not less than once each six months for the first year, permittee shall ascertain that available settling volume meets with this requirement and shall report this finding when submitting Discharge Monitoring Reports. Frequency during subsequent years shall be determined based on assessment of the information for the first year.

Permittee shall maintain or obtain records of rainfall representative of site conditions. All periods of rainfall which exceed the 10-year, 24-hour event or cause discharge from any overflow shall be reported to EPA.

[Note: No discharge from temporary ponds T1, T2 or T3 is permitted by this Authorization to Discharge. Any such discharge to Waters of the U.S. shall be reported in accordance with requirements of Part II.A.3.b. of the permit, except that the report shall be required within five days. Twice daily monitoring by grab sample with analyses to include TSS, pH and flow shall be required of any such discharge.]

The pH shall not be less than 6.0 standard units nor greater than 9.0 standard units and shall be monitored once per week.[1,4]

There shall be no discharge of floating solids or visible foam in other than trace amounts.

Samples taken in compliance with the monitoring requirements specified above shall be taken at the following location(s): points of discharge from treatment ponds A, B, C, D, E, and the quarry pond respectively, prior to mixing with any other waste stream.[3]

[1] Sampling and inspection of the filter and water level shall be conducted at least two times per week during periods when the water level is within 36 inches of the top of the overflow pipe. All periods of overflow shall be reported and representative samples collected and analyzed, with the first sample collected within 12 hours of start of overflow.

[2] In the event that effluent concentration exceeds 50 mg/1, permittee shall evaluate system performance to assure that the system is operating as designed and that on-site controls are effective. Permittee shall take appropriate corrective action as required.

[3] All periods of discharge from the Concrete Wash and Aggregate Washing Settling Ponds to OSN 007 shall be reported and monitored once per day for total suspended solids, total dissolved solids and pH on grab samples at the individual settling pond discharge points.

[4] Applicable to any flow up to the flow resulting from a 24-hour rainfall event with a probable recurrence interval of once in ten years.

[5] Applicable to OSN 003 only.

5. CRBRP further agrees to immediately cease all construction activities, and to restore the plant site as described in Chapter 5.0 of the "CRBRP Site Preparation Activities Report—June 1982" if the application for NPDES Permit No. TN0028801 is denied.

6. This agreement expires upon issuance of NPDES Permit No. TN0028801 or when site restoration under paragraph 5 is complete.

Aug. 5, 1982

DATE

/s/ Howard D. Zeller
HOWARD D. ZELLER
Assistant Administrator for Policy and Management

/s/ Percy Brewington, Jr.
PERCY BREWINGTON, JR.
Acting Project Director
Clinch River Breeder Reactor Plant Project