NATIONAL WILDLIFE FEDERATION, et al., Plaintiffs-Appellants,

v.

John O. MARSH, Secretary of the Army, et al., Defendants-Appellees.

No. 83–8193.

United States Court of Appeals, Eleventh Circuit.

Dec. 19, 1983.

768

Benjamin H. Terry, Michael Jablonski, Atlanta, Ga., Emmett B. Lewis, Washington, D.C., for plaintiffs-appellants.

Robert D. Daniel, Dept. of Justice, Washington, D.C., Jimmy J. Boatright, M. Theo-

dore Solomon, II, Alma, Ga., James Stokes, Atlanta, Ga., for defendants-appellees.

Before KRAVITCH and JOHNSON, Circuit Judges, and LYNNE *, District Judge.

KRAVITCH, Circuit Judge:

This is an appeal from a denial of preliminary injunctive relief by the District Court for the Southern District of Georgia. Appellants[1] seek to prohibit the release of funds by the Department of Housing and Urban Development ("HUD"), the expenditure of funds already released, and any other action in furtherance of the construction of Lake Alma, a man-made 1,400 acre lake in Bacon County, Georgia.

Appellants challenge the lawfulness of HUD's 1982 decision to release the funds for the Lake Alma Project and the Army Corps of Engineers' ("Corps") grant of a permit pursuant to § 404 of the Federal Water Pollution Control Act, as amended by the Clean Water Act, 33 U.S.C. § 1344, for construction of the dam for the lake.

In releasing the funds, HUD waived a regulation requiring that the project for which funds are issued must "principally benefit" persons of low and moderate income. Appellants contend (1) that the governing statute, 42 U.S.C. §§ 5301–5320, requires that over fifty percent of the persons benefited by funding issued thereunder be of low and moderate income and (2) that the Deputy Assistant Secretary of HUD had no authority to waive this requirement. Appellees argue and the district court held that the statute does not impose a *requirement* of fifty percent benefit to low and

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. Appellants include the National Wildlife Federation, the Georgia Wildlife Federation, the Hurricane Creek Protective Society, and various owners of property that will be affected by construction of Lake Alma. Appellees include John Marsh, Secretary of the Army; the Department of the Army and the Army Corps of

Engineers; HUD; Samuel Pierce, Jr., Secretary of HUD; the City of Alma and its various officials; Bacon County, Georgia; and the Alma-Bacon County Community Development Agency.

The district court held that appellants had standing to challenge HUD's release of the funds. Appellees do not challenge this ruling on appeal.

moderate income persons; that the fifty percent directive is regulatory only, *see* 24 C.F.R. § 570.302(b)(1), (d)(2) (1983); and that, therefore, the provision may be waived pursuant to 24 C.F.R. § 570.4.[2] Alternatively, appellants claim that even if the requirement is regulatory only, waiver of the regulation was arbitrary, capricious, and an abuse of discretion.

Appellants next argue that a supplemental environmental impact statement ("SEIS") was required before HUD or the Corps could release the funds or grant the § 404 permit because modifications in the plans subsequent to issuance of the final environmental impact statement ("EIS") would have a significant impact on the environment. Finally, they contend that the Corps acted unlawfully in granting a § 404 permit for the primary project prior to determining whether additional permits would be necessary for the modifications of the plan on which environmental approval for the entire plan is conditioned, and, if the additional permits are needed, prior to issuance of such permits.

 The district court rejected each of appellants' claims, ruled that there was no substantial likelihood of success on the merits,[3] and denied the preliminary injunction as well as a stay pending appeal. A panel of this court granted a temporary stay pending appeal. We affirm in part, reverse

2. 24 C.F.R. § 570.4 (1983) provides:
 The Secretary may waive any requirement of this part not required by law whenever it is determined that undue hardship will result from applying the requirement and where application of the requirement would adversely affect the purposes of the Act.

3. Appellants are entitled to preliminary injunctive relief only if they show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) the threatened irreparable injury to them outweighs the threatened harm the injunction may do to appellees; and (4) granting the preliminary injunction will not disserve the public interest. *Cate v. Oldham,* 707 F.2d 1176, 1185 (11th Cir.1983); *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 435, (5th Cir. Unit B 1981).

in part and remand for further proceedings.[4]

## I. *Background*[5]

### A. *Early History*

In 1968 the City of Alma ("Alma") was selected to participate in the Model Cities Program, pursuant to the Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C. §§ 3301–3374. Alma formulated its plan under the program centered around four cornerstone projects: (1) development of an air/rail industrial park, (2) improvement of water and sewage treatment facilities, (3) improvements to the airport, and (4) the construction of a reservoir on Hurricane Creek, now referred to as Lake Alma and the subject of this litigation. Alma secured funding for and completed the first three of the four cornerstone projects. Other community development projects, such as a residential community for the elderly and a recreation park, were constructed on the expected shoreline of the lake.

In 1971 HUD released funds for a feasibility study on the Lake Alma project and, in 1972, funds for preliminary engineering work. Additional funds were appropriated in 1973. In the same year a lawsuit was filed by plaintiffs challenging the project on the grounds that an EIS was required. *Deen v. Lynn,* CV No. 861 (S.D.Ga. Sept. 20, 1973). The suit was dismissed when HUD

4. In denying injunctive relief the district court inferred that appellees had been forced to jump through enough hoops imposed on them by "well-intentioned legislation" which has created a "bureaucratic morass." *National Wildlife Federation v. Marsh,* CV No. 582–98 (S.D.Ga. Mar. 3, 1983). It is not for the federal courts to editorialize about the wisdom of legislation. Rather, it is for us to apply the law, be it confusing or clear, well-intentioned or not. We may all sympathize with appellees' desires to construct Lake Alma, but that sympathy must not affect our application of the law.

5. The structure of the "Background" information is taken substantially from the district court opinion.

undertook preparation of an EIS. In 1974 HUD issued a draft EIS for the Alma project. Because the EIS engendered a substantial amount of criticism, it was withdrawn.

B. *HUD's Involvement in the Lake Alma Project as Administrator of the Community Development Block Grant Program*

In the meantime, Congress had enacted the Housing and Community Development Act of 1974 ("Act"), 42 U.S.C. §§ 5301–5320. Alma sought funding for the Lake Alma project under this Act and, pursuant thereto, assumed HUD's responsibility for ensuring compliance with all applicable environmental requirements.

Under the Act, in particular the Community Development Block Grant Program, HUD allocated funds for the Lake Alma project in fiscal years 1975 through 1979. The release of these funds, however, was conditioned upon the completion of an EIS for the project. Alma issued a final EIS in December, 1976, and submitted it to HUD in March, 1977, together with a request for release of the allocated funds.

By a letter dated March 24, 1977, the Deputy Assistant Secretary of the Interior informed the Mayor of Alma and HUD that the Department of the Interior opposed the project on environmental grounds. The Deputy Assistant Secretary stated that the Fish and Wildlife Service ("FWS") also objected to the project. On the same day the Deputy Administrator of the Environmental Protection Agency ("EPA") registered that agency's objections to the Lake Alma project. The next day a lawsuit was filed challenging HUD's funding of the project. *Hurricane Creek Protective Society v. Bacon County, Georgia,* CV No. 577–16 (S.D.Ga. March 25, 1977).

The Assistant Secretary of HUD informed Alma on April 4, 1977, that serious objections to the project had been raised and that Alma should consider withdrawing its request for the release of funds. Alma declined to do so. HUD considered the merits of the application and, after consultation with all federal agencies involved, refused to release the funds. HUD in-

formed Alma of the decision on August 10, 1977.

Alma requested that HUD conduct an administrative hearing and filed a crossclaim in the pending lawsuit seeking to compel HUD to release the funds. The lawsuit was dismissed, without prejudice, for want of prosecution in June, 1980, due to an agreement among the litigants that Alma would obtain a § 404 permit from the Corps before proceeding further with the project.

The Corps issued the § 404 permit in November, 1981. HUD reinstituted review of the Lake Alma project, receiving comments from certain interested parties. On January 20, 1982, HUD informed Alma it was considering funding the project on the condition that Alma certify satisfaction of four requirements: (1) that the EIS had been reviewed and, if necessary, revised, (2) that the project would principally benefit low- and moderate-income persons, (3) that the use of the lands acquired was in compliance with the applicable comprehensive open space plan, and (4) that the project description remained unchanged from the most recently approved HUD application.

In February, 1982, Alma responded and submitted documents declaring that all four of the requirements were satisfied. Upon review, HUD's Atlanta Area Office ("HUD-Atlanta") determined that Alma had satisfied the first, third and fourth conditions, but not the second. HUD-Atlanta found that, under the best assumptions, the project might barely qualify as principally benefiting low- and moderate-income persons but that, under more realistic assumptions, the project would not qualify. HUD-Atlanta therefore recommended to the Assistant Secretary of HUD that the funds not be released.

Upon review of HUD-Atlanta's report and recommendation, the Deputy Assistant Secretary agreed with the findings therein but refused to follow HUD-Atlanta's recommendation. Rather, the Deputy Assistant Secretary waived the principal benefit requirement on the grounds that to do oth-

erwise would result in undue hardship and would frustrate the purpose of the block grant statute. He directed HUD-Atlanta to inform Alma that the funds would be released.

C. *The Corps' Involvement in the Lake Alma Project*

As required by the agreement of the litigants in the second lawsuit, Alma applied to the Corps for a § 404 permit for the discharge of dredged and fill material. Public notice was issued and a public hearing was held with approximately 550 persons in attendance.

Supporters of the project included several state agencies and officials: the Governor of Georgia; the Georgia Department of Natural Resources ("DNR"); the Georgia State Clearing House; and the Southeast Georgia Area Planning and Development Commission. Opponents included nearly all federal agencies involved with conservation and environmental issues: the EPA; the Executive Office of the President, Counsel on Environmental Quality ("CEQ"); FWS; and the Bureau of Outdoor Recreation ("BOR"). Other opponents included: The Sierra Club; the National Wildlife Federation; the Georgia Wildlife Federation; the Georgia Conservancy; the Atlanta Audubon Society; the Georgia Ornithological Society; and the Hurricane Creek Protective Society.

After thorough analysis, the Corps' District Engineer for the Savannah District recommended to the Divisional Engineer for the South Atlantic Division that the permit be denied for environmental reasons. The divisional engineer directed his staff to further investigate the critical issues, made a personal inspection of the site, received comments from interested state and federal agencies and asked the District Engineer for a reevaluation.

At this time a major development occurred. The FWS issued a Mitigation Study for the Lake Alma project. The Study proposed a plan whereby the loss of 1,400 acres of bay and branch swamp would be mitigated with creation of six green tree reservoirs ("GTRs"), combined with intense wildlife management of the proposed project area.[6] Conditioned on the implementation of this Mitigation Plan, the FWS and the BOR, now the Heritage Conservation and Recreation Service, withdrew their objections to the issuance of the § 404 permit. The EPA and CEQ, however, maintained their opposition to the project.

During this period a new District Engineer had assumed charge of the Savannah District. After apparently comprehensive analysis, he concluded that the permit should be issued, but only on condition that the Mitigation Plan be implemented. This recommendation was forwarded to and accepted by the Divisional Engineer. The Divisional Engineer informed the EPA that the permit would be granted unless the EPA requested that the issue be elevated to the department level for further review. EPA requested the elevated review, which was conducted by the Office of the Chief of Engineers ("OCE").

The EPA and the CEQ continued to object to the construction of Lake Alma due to its anticipated environmental impact. In addition, both attacked the Mitigation Plan on the ground that it would not adequately mitigate the loss of the wetlands and that the proposed GTRs could create additional water quality problems. The EPA at this time brought to the attention of the Corps the possibility that the GTRs themselves would require § 404 permits, separate and distinct from the § 404 permit required for the entire project. In response to this last issue, OCE conducted a site inspection and concluded that individual § 404 permits for the GTRs might be required, but, due to the uncertain location of the reservoirs, there

6. Green tree reservoirs are small, shallow, wooded impoundments that are flooded in the fall to provide habitats for certain types of wildlife, especially water fowl. The GTRs are then emptied in the spring when the trees are ending their period of winter dormancy and the wildlife has less need for the reservoirs.

was a possibility that all of the GTRs could be covered by a nationwide permit.[7]

OCE held a public hearing on the Lake Alma project in January, 1980, with officials from the Corps, EPA, and CEQ present. Subsequently, OCE ordered preparation of a study concerning the Mitigation Plan and the GTRs. The Environmental Protection Division of the DNR made and released this study in April, 1980. Despite criticism by both the EPA and the FWS questioning the methods employed in the study, OCE concluded that the § 404 permit should be issued. Following EPA's request for elevated review, the Assistant Secretary of the Army ordered the OCE to update the administrative file and directed that a new study on the GTRs be undertaken, this time in consultation with the FWS and the EPA.

On the basis of this study, completed in July, 1981, and the other information before him, the Assistant Secretary decided that the § 404 permit should be issued. EPA was notified of this decision and of its option to elevate review to the Secretary of the Army. In a letter dated October 9, 1981, the Administrator of the EPA informed the Corps that the EPA's questions regarding the loss of wetlands and the water quality of Lake Alma had been adequately answered and that the EPA now withdrew its objection to the project.

At the direction of the Assistant Secretary of the Army, the District Engineer on November 10, 1981, issued the § 404 permit to construct the dam for Lake Alma. This lawsuit ensued.

## II. *HUD Authority to Waive the Principal Benefit Regulation*

This issue was framed in the court below and by the parties on appeal as whether the requirement that funds "principally" benefit low- or moderate-income persons is a statutory or a regulatory requirement. All agreed that if it were regulatory only, the Secretary of HUD has the authority pursuant to 24 C.F.R. § 570.4[8] to waive it. The

district court concluded that while principally benefiting low- and moderate-income persons is the primary *goal* of the statute, 42 U.S.C. § 5301(c), the principal benefit *requirement,* 24 C.F.R. § 570.302(b)(1), (d)(2), was regulatory only and could be waived, and that the only statutory requirement is that the funded project give "maximum feasible priority" to benefiting low- and moderate-income persons.

 It is clear from the face of the statute that no explicit principal benefit requirement is statutorily imposed. "Principally benefiting" is explicitly made the primary *goal* of the statute, not a requirement. Preambles to statutes do not impose substantive rights, duties or obligations. *See Association of Am. Railroads v. Costle,* 562 F.2d 1310, 1316 (D.C.Cir.1977); *Alexander v. HUD,* 555 F.2d 166, 171 (7th Cir. 1977). The statute requires only that the "maximum feasible priority" be given. Accordingly, it is critical to determine what the statutory requirement of giving maximum feasible priority, which all concede is a nonwaivable requirement, really means, and what it actually requires.

The thrust of appellants' argument is that "maximum feasible priority" implicitly requires that *at least* fifty percent of the beneficiaries of a funded project be of low- or moderate-income and that above that level the highest priority feasible is to be given to benefiting such persons. In other words, appellants assert, "maximum feasible priority" means "maximum feasible priority above fifty percent." Appellees have failed to interpret "maximum feasible priority," other than to argue that it does *not* mean at least fifty percent low- and moderate-income beneficiaries because, if that is what Congress intended, it would have said so in clear terms.

 When faced with an issue of statutory interpretation, "[a]bsent a clearly expressed legislative intention to the contrary, [the statutory] language must ordinarily be

---

**7.** Nationwide permits are those issued by regulations and requiring no separate permit application.

**8.** *See* note 2 *supra.*

**774**

regarded as conclusive." *North Dakota v. United States,* — U.S. —, 103 S.Ct. 1095, 1102–03, 75 L.Ed.2d 77 (1983), *quoting Consumer Products Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) [hereinafter *CPSC*]. This guideline presupposes that the "plain meaning" of the statute can be deduced from its terms. *CPSC,* 100 S.Ct. at 2056. *Accord Frank Diehl Farms v. Secretary of Labor,* 696 F.2d 1325, 1331 (11th Cir.1983); *Hills v. Commissioner,* 691 F.2d 997, 1000 (11th Cir.1982). Here, the "plain meaning" of the term "maximum feasible priority" is not readily apparent. Accordingly, recourse to the legislative history of the statute is necessary. *See Newport News Shipbuilding and Dry Dock Co. v. EEOC,* — U.S. —, 103 S.Ct. 2622, 2627, 77 L.Ed.2d 89 (1983) (where statute does not define relevant term, court "must therefore go beyond the bare statutory language").

In enacting the Housing and Community Development Act of 1974, Congress authorized the Secretary of HUD to issue block grants to localities for revitalization and maintenance of our nation's cities. As Congress stated: "The primary objective of this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low- and moderate-income." 42 U.S.C. § 5301(c).

In setting the requirement for approval or disapproval of applications for grants, Congress established:

Any grant under this chapter shall be made only on condition that the applicant certify to the satisfaction of the Secretary that its Community Development Program has been developed so as to give maximum feasible priority to activities which will benefit low- or moderate-income families or aid in the prevention or elimination of slums or blight. The Sec-

retary may also approve an application describing activities which the applicant certifies and the Secretary determines are designed to meet other community development needs having a particular urgency as specifically described in the application.

42 U.S.C. § 5304(b)(2). The Lake Alma funds were applied for only under the "benefit to low- or moderate-income persons" prong, Alma never having certified that the project would remove or prevent blight or that any other urgent need applied. Thus, our review is limited to the propriety of the authorization of funds under the first standard.

The legislative history of this section of the statute began in the Senate. The original Senate version of 42 U.S.C. § 5304(b)(2) contained a limitation that no more than twenty percent of funds issued for a particular program could be used so as not "to be of direct and significant benefit to families of low or moderate income ...." S.Rep. No. 693, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 4273, 4322; *see also id.* at 4400. This requirement of eighty percent use for low- or moderate-income persons was to be applied "unless the Secretary finds modification of the limitation necessary to meet urgent community needs." *Id.* at 4322. The Senate wished to include the statutory limitation "[i]n order to assure ... that the activities undertaken by a community development agency reflect the national priorities for which assistance is provided ...." *Id.* Although the Senate committee members dealing with the bill had divergent views as to the propriety of the limitation, all seemed to agree on the purpose to be served by the eighty percent requirement: limiting the discretion of localities to use community development funds for purposes other than those set forth in the statute.[9]

**9.** Senators Tower, Packwood, and Brock criticized many of the limitations in the Senate Committee version of the bill as strictly limiting the discretion of local communities and almost certainly "giv[ing] rise to a variety of interpretative problems, and ... open[ing] the

door to future efforts by Federal bureaucrats to impose their own thinking as to desirable community objectives and strategies upon local programs." Supplemental Views of Messrs. Tower, Packwood, and Brock, 1974 U.S.Code Cong. & Ad.News at 4434. In reference to the

The eighty percent requirement was deleted from the bill by the Conference Committee before final passage. In lieu thereof the "maximum feasible priority" language made its debut:

> The Senate bill contained a provision not contained in the House amendment prohibiting more than 20 percent of an applicant's community development funds to be used for activities which do not directly and significantly benefit low- and moderate-income families or blighted areas. The conference report contains, in place of the Senate provision, a requirement that the applicant certify to the · HUD Secretary's satisfaction that its program has been developed so as to give maximum feasible priority to activities which will benefit low- and moderate-income families or aid in the prevention or elimination of slums or blight.

S.Conf.Rep. No. 1279, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 4449, 4453 (emphasis deleted). This is the sum and substance of guidance given by the 93rd Congress on the meaning of "maximum feasible priority." It is clear at this stage in the history that adoption of the term signaled a rejection of the eighty percent use requirement. While the legislative history is silent on Congress' reasons for the rejection, given the criticism by several Senators, we can infer that it was prompted primarily by a belief that the requirement would place too rigid a restriction on local government discretion. What limits on discretion 'were intended by "maximum feasible priority," however, we are not told. It is probable that Congress deliberately avoided the issue, not setting any specific percentage limits on the authorization of funds.

eighty percent requirement in particular the three Senators stated:

> [T]he provision with all the potential uncertainties as to what benefits are both "direct" and "significant" is almost certainly to become a source of widespread contention and controversy. Communities may find themselves arguing with Federal program reviewers who have their own ideas as to what qualifies and what does not in the context of local demography and neighborhood conditions.

*Id.*

Senator Taft, on the other hand, expressed support for the provision, support apparently ratified by the entire Committee as the Committee bill contained the provision.

> [T]o accompany the increased local flexibility resulting from the merger of these programs, a clear federal directive is needed which channels (but does not mandate specifically) the use of funds. With the advent of general revenue sharing ... there is no reason to create another fund transfer program which simply provides localities with more federal money to use virtually as they see fit. In addition, the benefits and injuries caused by any community development program can accrue to citizens of widely varying income levels depending on the specific program. That quality makes community development funds all the more susceptible to questionable use if no specific directives for use are given. Furthermore, the essence of any community development program—housing and physical development and redevelopment— probably deals more fundamentally with the

problems of economic and racial integration, which have proved so difficult for localities to tackle even with strong federal directives, than any other federal program. Because of such problems, I feel that community development is one of the least suitable types of programs areas [*sic*] for a totally "hands off" revenue sharing approach. Accordingly, I consider strong federal directives for the program not to constitute support of bureaucrats "second-guessing," but rather to be a necessity for fulfillment of the federal responsibility to the taxpayers to promote the use of their money in as productive a manner as possible.

> I consider the need for such a directive to be fulfilled adequately by the requirement that unless HUD grants an exception, at least 80% of a community's funds must be expended for activities intended to be of direct and significant benefit to blighted or deteriorating areas or to families with low and moderate incomes. *This provision affects the very heartbeat of the bill* because it requires most funds to be spent for what have always been considered to be the most important purposes of federally supported community development program, assuming that "direct and significant" is interpreted in a sensibly broad manner. In view of HUD's authority to interpret the broad requirement and to make exceptions, I believe that any administrative burden caused will be outweighed by a greater understanding of and commitment to these purposes at both the federal and the local levels.

Additional Views of Mr. Taft, 1974 U.S.Code Cong. & Ad.News at 4439 (emphasis added).

■ To gain insight into this question, we have explored the subsequent history of the Housing and Community Development Act. We bear in mind that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *CPSC,* 447 U.S. at 117, 100 S.Ct. at 2061 (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960)). Given the paucity of guidelines, however, any assistance available must be accepted.

The Conference Report for the 1977 amendments to the statute suggests that the conferees may have interpreted § 5304(b)(2) in the way appellants urge: "maximum feasible priority" as a requirement to give as much priority as possible over fifty percent to activities benefiting low- and moderate-income persons. The report states: "The committee ... does not intend that this amendment change the *requirement* that community development grant funds must, to the maximum extent feasible, be used for activities *primarily benefiting* low and moderate income persons ...." H.Conf.Rep. No. 634, 95th Cong., 1st Sess. 47, *reprinted in* 1977 U.S. Code Cong. & Ad.News 2965, 2968 (emphasis added). This language reflects that particular Congress' understanding that maximum feasible priority means above and beyond primarily benefiting low- and moderate-income persons. *But cf.* Staff Report on the Community Development Block Grant Program, Subcommittee on Housing and Community Development of the House Committee on Banking, Finance and Urban Affairs, 95th Cong., 1st Sess. 5 (1977) ("While [maximum feasible priority] appears to focus on funding priorities, the focus is still extremely broad. Given the procedural objectives of the program, this provision would appear to proscribe only those individual activities which are clearly unrelated to ... low or moderate income persons ...").

Later in this report the Conference Committee adopted a Senate amendment to § 5304(c)(3) providing for disapproval of block grant applications that do not comply with the primary purpose of principally benefiting low- and moderate-income persons: "The Conference report contains the Senate provision amended to specifically incorporate the present [1974] law *requirements* that no application be approved unless it ... *principally benefits* persons of low- and moderate-income ...." H.Conf. Rep. No. 634, 95th Cong., 1st Sess. 50, *reprinted in* 1977 U.S.Code Cong. & Ad.News at 2970 (emphasis added).

In 1981 Congress repealed and rewrote major portions of the statute, restructuring its provisions to emphasize administrative oversight of post-award use of funds instead of stringent enforcement of detailed application requirements. It stated its reasons for so doing thus:

In the period since 1974, various pressures from both Congress and within HUD, have worked both to narrow the focus of the program and to layer thicker and more restrictive regulations on the application .... The HUD regional and area office staff has used the application process far too frequently as a means for imposing HUD's views of acceptable program activity on local entities.

S.Rep. No. 139, 97th Cong., 1st Sess. 227, *reprinted in* 1981 U.S.Code Cong. & Ad. News 396, 523. Nevertheless, Congress retained "maximum feasible priority" as a project requirement to which each applicant must certify when applying for funds under the low- and moderate-income provision of the statute. *See* 42 U.S.C. § 5304(b)(3) (Supp.1982).

Whether the "principally benefit" regulation, 24 C.F.R. § 570.302(b)(1), (d)(2), was one of the "restrictive regulations" to which the Senate reacted is not clear. In light of the fact, however, that soon thereafter HUD took steps to modify substantially its principal benefit requirement, *see* Proposed Amendments to Community Development Block Grants, 47 Fed.Reg. 43900, 43923 (1982); 24 C.F.R. § 570 (1983), and accompanying editorial note; Intergovernmental Review of the Department of Housing and Urban Development Programs and Activities, 48 Fed.Reg. 29206, 29218 (1983), it is

likely that the requirement was considered one of the "restrictive regulations."[10] It would be illogical therefore to interpret "maximum feasible priority" as containing an implicit "principal benefit" requirement. Congress decried the restrictive regulations, which HUD subsequently modified by proposing removal of, among other things, the principal benefit requirement, yet retained the "maximum feasible priority" requirement as part of the program's certification procedure.

Our inquiry next turns to the history of the implementing regulations to the statute. We must accord "great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). "[T]his Court will normally defer to an agency's determination 'when the administrative practice at stake "involves a contemporaneous construction of a statute by" ' " the responsible administrative agency. *Veteran's Admin. Medical Center v. FLRA,* 675 F.2d 260, 262 (11th Cir.1982) (quoting *Power Reactor Dev. Co. v. International Union of Elec., Radio & Machineworkers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961) (quoting *Norwegian Nitrogen Prods. Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933))). Unfortunately, the agency's contemporaneous and subsequent interpretations of the statutory language are unclear and seemingly inconsistent. Certainly, contrary to appellees' assertions, no one interpretation is longstanding.

The 1978 administrative regulations implementing section 5304(b)(2) require that at least fifty percent of the persons benefited must be of low- or moderate-income. 24 C.F.R. § 570.302(d)(2). The original 1974 implementing regulations, however, did not by their terms contain a principal benefit requirement. *See* Rulemaking, Community Development Block Grants, 39 Fed.Reg. 40136 (1974). Instead they required an applicant to identify community development needs and a strategy for meeting those needs, and to specify both short and long term objectives developed in accordance with area-wide development planning and national urban growth policies. *Id.* at 40144. These regulations could be interpreted as an indication that HUD, at least originally, did not construe "maximum feasible priority" to include a principal benefit requirement.

In 1977, three years after Alma applied for funding under the Act, HUD first proposed the principal benefit regulation, Proposed Rulemaking, Housing and Community Development Act, 42 Fed.Reg. 56450 (1977), stating:

> The experience gained in carrying out the block grant program has caused some concern that the statutory intent was not being met in a consistent fashion, and that benefits to lower-income persons might be diminishing. The 1977 amendments to the Housing and Community Development Act include additional language concerning benefits to low- and moderate-income persons. It was therefore decided to propose a rule which con-

<hr>

**10.** On October 4, 1982, HUD published proposed amendments to 24 C.F.R. § 570, though their effective date was not announced:

> The overall thrust of these regulations is to eliminate unnecessary requirements that exceed statutory intent.... A principal objective of the amendments ... was "to 'deregulate' programs ... where Federal regulatory intrusion has unnecessarily encumbered the process of receiving Federal funds without a concomitant contribution to program quality...."

Proposed Amendments to Community Development Block Grants, 47 Fed.Reg. 43900 (1982) (quoting S.Rep. No. 87, 97th Cong., 1st Sess. 2 (1981)).

Although the proposed amendments retain the principal benefit language as part of the description of the statute's "primary objective," the phrase has been dropped from the enumerated program requirements. The grantee is required to certify only that the "projected use of funds [will] give maximum feasible priority to activities which benefit low and moderate income families...." 47 Fed. Reg. at 43923 (1982) (to be codified at 24 C.F.R. § 570.302, .303(e)). While this modification is not conclusive proof of Congress' displeasure with HUD's previous interpretation of the statute, it is strong evidence that HUD believed inclusion of a principal benefit provision was no longer the intent of Congress.

tained specific controls on the use of funds to assure that low- and moderate-income persons are the principal beneficiaries.

The proposed rule is that all block grants must be used for projects which principally benefit low- and moderate-income persons.

*Id.* at 56454. This proposal reflects two possible HUD interpretations: (1) that the statute embodies a requirement of principally benefiting low- and moderate-income persons; and/or (2) in HUD's opinion, there had been times prior to 1977 when the statute had been applied so as not to principally benefit low- and moderate-income persons.

The 1977 rules provided for exceptions to their requirements "where clearly necessary to attain other statutory objectives." *Id.* Appellees persuasively argue that if the principal benefit requirement were statutorily required, the agency would have had no power either to make exceptions to it or not to have applied it between 1974 and 1977. Indeed, when the principal benefit regulation was finally promulgated, HUD "concluded that the requirement is statutorily *permissible* . . . ." Rulemaking, Housing and Community Development Act, 43 Fed. Reg. 8450, 8451 (1978) (emphasis added).

Given that a question had been raised in HUD's collective mind whether the principal benefit requirement was even permissible, and given HUD's failure to include the requirement in the original regulations, it appears HUD did not interpret the statutory "maximum feasible priority" requirement to embody a principal benefit requirement, even though it interpreted Congress' overriding intent behind the statute to be one of principally benefiting low- and moderate-income persons.

▪ The district court properly relied upon the rule of deference to agency interpretation, deferring to HUD's original interpretation of the statute and its 1981 decision that the principal benefit requirement

was regulatory only and therefore waivable. In the matter before us, however, other principles of statutory construction also apply and unfortunately present a conflict.

[T]he courts are the final authorities on issues of statutory construction. They *must reject* administrative constructions of the statute . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.

*Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1982) (emphasis added); *see also Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). "In order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose." *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *accord Coca-Cola Co. v. Atchinson, Topeka, and Santa Fe Ry. Co.,* 608 F.2d 213, 222–23 (5th Cir.1979).[11] The statutory language is to be interpreted "in a way that accomplishes the obvious purpose of Congress in enacting the statute." *WTWV, Inc. v. National Football League,* 678 F.2d 142, 143 (11th Cir.1982).

Unquestionably, the statute's primary objective is "the development of viable urban communities, by providing decent housing and a suitable living environment, and expand the economic opportunities, principally for persons of low- and moderate-income." 42 U.S.C. § 5301(c). To interpret "maximum feasible priority" to allow approval of projects that have as their principal beneficiaries persons who are not of low- or moderate-income would appear inconsistent with this primary goal, the "very heartbeat of the bill," Additional Views of Mr. Taft, S.Rep. No. 693, 93d Cong., 2d Sess., *reprinted in* 1974 Code Cong. & Ad.News 4273, 4439, and to violate the rule of statutory interpretation set forth immediately above.

---

11. The Eleventh Circuit, in *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

■ The conflict is not easily resolved. After examining the relevant legislative and regulatory history, as well as arguments of counsel, however, we conclude that the statutory requirement of "maximum feasible priority" does not embody a required floor that in each case the funds at least principally benefit low- and moderate-income persons. While it seems anomalous that the requirements of the statute would allow authorization of grants that do not satisfy the primary objective of the statute, the legislative history accompanying the original adoption of the "maximum feasible priority" language leads us to conclude that Congress rejected an explicit percentage floor for the use of funds. If it intended another percentage minimum to replace the eighty percent figure it rejected, it could have said so. Although Congress has been presented with various opportunities to clarify the meaning of "maximum feasible priority," it has declined to do so. It appears that while the systemic goal behind the statute was principally to benefit low- and moderate-income persons, Congress did not intend for that goal to be met absolutely by every funded project. See Staff Report on the Community Development Block Grant Program, Subcommittee on Housing and Community Development of the House Committee on Banking, Finance and Urban Affairs, 95th Cong., 1st Sess. 5 (1977). The history of the implementing regulations is consistent with this interpretation.

■ In summary, we conclude that "maximum feasible priority" does not embody the principal benefit requirement. The district court therefore properly interpreted the principal benefit requirement as regulatory[12] and waivable under 24 C.F.R. § 570.4.

## III. Waiver of the Principal Benefit Requirement

■ The district court correctly noted that the standard of review for HUD actions is whether they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Mejia v. HUD, 688 F.2d 529, 531 (7th Cir.1982). The Secretary of HUD has authority to waive the principal benefit requirement only if "it is determined that undue hardship will result from applying the requirement and where application of the requirement would adversely affect the purposes of the Act." 24 C.F.R. § 570.4. The issue is whether the Deputy Assistant Secretary abused his discretion in finding that application of the regulation would result in undue hardship and adversely affect the purposes of the block grant statute. We conclude that he did not.

### A. Undue Hardship

In a letter supporting his decision to waive the principal benefit requirement, the Deputy Assistant Secretary concluded that the project qualified as an activity benefiting low- and moderate-income persons and that imposition of the requirement would result in undue hardship. His conclusions were founded upon three considerations. First, Lake Alma was the hub of a larger development program that began over a decade ago under the Model Cities Program,[13] which was instituted in 1966 to provide financial assistance to cities in an effort to overcome economic and social problems associated with urban life. 42 U.S.C. § 3301. In developing its program, Alma sought to alleviate area problems of poverty, a critical shortage of recreational facilities and the need for industrial development. To respond to these problems, the city proposed the development of four cornerstone projects: an air/rail industrial park, improved water and sewerage facilities, modernized airport services, and Lake Alma. The lake was intended to provide

---

**12.** We base this conclusion primarily on the 1974 Congress' rejection of the eighty percent requirement, its failure explicitly to replace it with any other percentage requirement and the absence of any principal benefit requirement in the 1974 regulations that would evidence a statutorily mandated interpretation of "maximum feasible priority" to include a principal benefit requirement.

**13.** Demonstration Cites and Metropolitan Act of 1966, 42 U.S.C. §§ 3301–3374.

recreational opportunities and to induce economic development.

Although each of the four projects was designed to provide benefits independent of the other three, Lake Alma was viewed as the "urban shaper of the four," and as such, millions of dollars of public and private investment were spent developing and constructing projects that conceptually and physically are connected to the lake. A fifty-two unit home for the elderly was built in a location overlooking the proposed shore of the lake; the city's urban renewal projects were built next to the proposed lake; and a recreational park was planned to surround Lake Alma on three sides, some facilities of which have already been completed.[14] In fact, most of Alma's revitalization projects, including the cornerstone projects, were designed and constructed in anticipation of Lake Alma.

A second reason offered by the Deputy Assistant Secretary in support of his waiver is the potential waste of large sums of local and federal funds already invested in the plan. In addition to the $500,000 expended under the Model Cities Program, over $2.3 million in block grant funds had been allocated to the project from 1975 through 1977. Since the principal benefit regulation did not become effective until 1978, the Deputy Assistant Secretary concluded that failure to waive the requirement would effectively hold these previously allocated funds "hostage" to the appropriations set aside for 1978 and 1979.

The Deputy Assistant Secretary's third consideration supporting his conclusion that undue hardship would result if the principal benefit regulation were not waived was the near-majority low- and moderate-income population in the area benefiting from the project (46.2% in Bacon County; 41.9% in the twenty-one county service area). Although the regulation was not completely satisfied by these figures, he noted that the standard was nearly met and that the

project did qualify as an activity benefiting low- and moderate-income persons.

When examining decisions of agency officials, the reviewing court is not empowered to substitute its own judgment for that of the agency. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *McHenry v. Bond,* 668 F.2d 1185, 1190 (11th Cir.1982). Review is limited to determining whether the agency has articulated "a rational connection between the facts found and the choice made." *Bowman,* 419 U.S. at 285, 95 S.Ct. at 442 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). Moreover, in assessing the rationality of an agency decision, the court must give appropriate deference to the wisdom of agency officials in deciding issues within their area of expertise. *See McHenry,* 668 F.2d at 1190; *Watkins Motor Lines, Inc. v. I.C.C.,* 641 F.2d 1183 (5th Cir. Unit B 1981).

The Deputy Assistant Secretary concluded that undue hardship would result if the principal benefit regulation were not waived. We find his decision wholly rational and supported by substantial evidence in the record. If the project is defeated by rigid application of the regulation, the citizens of Bacon County and the surrounding area, many of whom are intended beneficiaries of the block grant program, could lose the benefits of a development program that was conceived years before promulgation of the regulation, implemented to a significant extent to date, and in large part dependent upon the completion of its final "cornerstone," Lake Alma. Considerable federal funds, expended or allocated, would be wasted as well. In addition, the program is related to the plight of low- and moderate-income persons. Statistical evidence indicates that a substantial minority, if not a numerical majority, of the users of Lake Alma will be lower income individuals.

14. Feb. 28, 1979, Referral Report of Col. Tilford C. Creel, District Engineer, Army Corps of Engineers at 2–3.

Given these circumstances, a finding of undue hardship was reasonable.

### B. *Adverse Effect on Purpose of the Act*

In order to waive the principal benefit provision, the Secretary of HUD must also make a finding that application of the standard would adversely affect the purposes of the Act. 24 C.F.R. § 570.4. In concluding that it would, the Deputy Assistant Secretary determined that enforcement of the regulation would frustrate two purposes of the Act: (1) encouraging community development activities which are consistent with comprehensive local and area-wide planning and (2) fostering the undertaking of community development activities in a coordinated and mutually supportive manner by federal agencies and programs, as well as by communities. *See* 42 U.S.C. § 5301(d)(2), (4).

Appellants do not dispute that these two purposes of the Act will be adversely affected by application of the principal benefit standard. They maintain, however, that these are only subsidiary purposes of the block grant statute and that the primary purpose of principally benefiting low- and moderate-income persons will be adversely affected if the regulation is waived. Taking HUD's position to its logical extreme, appellants contend, the agency could provide funding for a project completely outside its area of concern and without regard to the statute's purpose [15] by waiving its regulatory requirements.

Appellants' argument, simply stated, is that HUD abused its discretion when it waived application of a provision that transforms a statutory purpose, in this case the purpose of principally benefiting low- and moderate-income persons, into a regulatory requirement. Our adoption of this position, however, would in effect nullify our holding that the principal benefit requirement is not statutorily mandated but is only regulatory and therefore waivable. To accept appellants' argument would mean that by adopting a presumably waivable regulation parroting the stated legislative purpose, HUD would have inadvertently elevated that statutory purpose to the level of an express, mandatory statutory requirement. In essence, HUD would be precluded from waiving any regulation that furthers the primary purpose of the Act, because waiving application of the regulation would be contrary to legislative intent. Such a rule would deprive HUD's waiver authority under 24 C.F.R. § 570.4 of all practical significance.

The issue under § 570.4 is not whether waiving the principal benefit standard will itself further the purposes of the statute. Rather, the question is whether given the circumstances presented to the Secretary, "application of the requirement would adversely affect the purposes of the Act." 24 C.F.R. § 570.4. Here, application of the principal benefit requirement would adversely affect two of the stated purposes enumerated in 42 U.S.C. § 5301(d). Moreover, if the regulation is enforced and Lake Alma is not completed, the primary purpose of the statute will also be adversely affected: even if the primary objective of the Act will not be absolutely met by the project, that objective will be furthered significantly by construction of the lake. Precluding HUD funding for the lake would adversely

---

**15.** The dissent suggests a luxury condominium as an example. We note that even if HUD waived its principal benefit regulation, such a project could not be funded unless it satisfied the statutory maximum feasible priority requirement. Moreover, waiver of the regulation for a project so clearly unrelated to the interests of low- and moderate-income individuals would be contrary to legislative intent and would likely be an abuse of agency discretion. One of the facts relied upon by the Deputy Assistant Secretary in support of the waiver was that the project would very nearly satisfy the principal benefit standard by directly benefiting a large percentage of the lower income population. Even though Lake Alma does not satisfy a fifty-percent benefit threshold, its construction will significantly further the systemic goal of the statute by providing substantial benefit to individuals in the low- and moderate-income community. A luxury condominium, which would provide only speculative, indirect benefits to the surrounding community, would not further the purpose of the statute to any significant extent.

affect that purpose by eliminating the recreational and economic benefits of the lake to the near-majority low- and moderate-income persons living in the service area. In sum, there is sufficient support for the Deputy Assistant Secretary's conclusion that application of the principal benefit regulation would adversely affect the purposes of the Act. Finding his decision rational and supported by the evidence, we affirm the district court's holding that HUD's waiver of the regulation was not an abuse of discretion. *See McHenry v. Bond,* 668 F.2d 1185 (11th Cir.1982).

## IV. *Supplemental Environmental Impact Statement*

Appellants contend that adoption of the Mitigation Plan is a significant change requiring that an SEIS be prepared. The district court concluded that release of the funds by HUD and issuance of the § 404 permit by the Corps was proper because a conclusion by the Alma officials, who had assumed the position of the responsible federal officials under 42 U.S.C. § 5304(h), that no SEIS was required, was "reasonable." We disagree, and reverse and remand on this ground.

 In *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 992 (5th Cir. Unit A 1981),[16] the court noted that "the legal standard of the need for a supplemental EIS . . . is whether the post-[original EIS] changes in the [project] will have a 'significant' impact on the environment that has not previously been covered by the [original] EIS." If a "significant" impact on the environment will result, either "in qualitative or quantitative terms," from subsequent project changes, an SEIS is required. *Id.* at 991.

 In reviewing an agency decision on the necessity for an SEIS, "the reviewing court should uphold the agency's deci-

sion only if it is reasonable, rather than use the deferential 'substantial evidence' standard." *Id.* at 992 (citing *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 424–25 (5th Cir.1973); *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466–67 (5th Cir.1973)). The district court concluded that the decision of the Alma officials not to submit an SEIS covering the Mitigation Plan was "reasonable" because "the change is insignificant quantitatively and *non-existent* qualitatively." *National Wildlife Federation v. Marsh,* CV No. 582–98 at 35 (S.D.Ga. Mar. 3, 1983) (emphasis added). At least the second half of this conclusion is clearly erroneous.

The Alma officials, in conveying to HUD their opinion that no SEIS was required, relied on the concurrence among all relevant governmental agencies that "no substantial *adverse* effect to the environment would result from . . . construction [of the GTRs] in conjunction with Lake Alma." [17] They also relied on a letter by the EPA Administrator agreeing with the Corps that the waters to be released for the GTRs "are not expected to *adversely* affect its water quality." [18] Neither of these agencies nor the Alma officials focused on the degree of mitigation, the beneficial impact, of the Mitigation Plan.

In *EDF v. Marsh,* the court reversed the district court's conclusion that the agency decision not to supplement an EIS was reasonable. The court made clear that even if post-EIS changes in a project are *beneficial* to the environment or are intended to mitigate environmental impact, if those changes are significant, a supplemental statement is required:

> The proper question is not the intent behind the actions, but the significance of the environmental impacts. And even if the Corps was correct in deciding that the

---

16. Decided July 13, 1981, *EDF v. Marsh* is binding precedent on this panel. *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc).

17. Plaintiffs'/Appellants' Exhibit 23, Enclosure 1, page 2 (emphasis added).

18. Plaintiffs'/Appellants' Exhibit 23, Enclosure 1–B, page 2 (emphasis added); *see also* Defendants'/Appellees' Exhibit 5, page 20.

new land use will be beneficial in impact, a beneficial impact must nevertheless be discussed in an EIS, so long as it is significant. NEPA is concerned with all significant environmental effects, not merely adverse ones.

651 F.2d at 993. The court also emphasized that the district court erred in assessing the significance only of the increased acreage needed for the mitigation project because where "the new land would be *used* in a way that had significant effects on the environment, which obviously could not have been addressed in the [original] EIS," an SEIS is required. *Id.* (emphasis supplied).

The lower court in this case relied on a portion of the *EDF v. Marsh* opinion in which the court concluded that one of the several post-EIS changes did not require an SEIS. This reliance was misplaced. The change deemed insignificant in that case involved a 9 million cubic yard increase in the amount of spoil excavated from a 260 million cubic yard excavation plan. Plaintiffs had offered no proof of a qualitatively significant impact, and the quantitative effect, a 3.5 percent increase in spoil removal, was considered insignificant.[19] Here, however, appellants have shown that the Mitigation Plan involves a number of proposed project changes that are likely to have a significant, though beneficial, impact on the environment in and around the proposed lake.

The Mitigation Plan proposes the construction of 194 acres of GTRs, which represent not only an increase in the quantity of land affected, but also a change in the character of the land itself. The GTRs would involve annual flooding, selective clearing, creation of five percent permanent water, development of small islands, planting grasses or sedges, and erecting wood duck boxes. Moreover, in addition to the six GTRs, the plan establishes a program for intense wildlife management throughout the entire project area. The wildlife management plan includes: selective clearing of 466 acres of wooded swamp; creation of small pools of standing water; planting of oak trees; development of an emergency access road; construction of firebreaks and prescribed burning to manage sand ridge areas; selective thinning and burning of planted and natural pine areas; and staged disking, seeding and mowing of old fields, pastures and rights-of-way. The GTRs and wildlife management plan are therefore easily distinguishable from the increase in excavated spoil in *EDF v. Marsh.* Here the plan envisions a change in the types of activities to be undertaken on the land, not merely an incremental increase in an activity that was fully evaluated in a previous EIS.

Until proposal of the Mitigation Plan by FWS, all interested federal agencies had opposed the project on environmental grounds. The § 404 permit was approved by the Corps only on the condition that the plan be implemented.[20] FWS approved the project conditioned on acceptance of the plan, and EPA withdrew its objections only after adoption of the plan and after con-

**19.** Because we conclude that the Mitigation Plan constitutes a significant qualitative impact on the environment, we need not decide whether its quantitative effect is also significant. Abstract numerical comparisons are frequently misleading and inconclusive, as this case illustrates. The GTRs would affect about 194 acres of the 1400 proposed for the entire project, an impact on approximately 14% of the total project land. Compared with the 3.5% increase in land affected by the change found insignificant in *EDF v. Marsh,* 651 F.2d at 996 n. 15, this change might be considered a significant quantitative impact. Using *volume* of water affected rather than acres of land, however, the figures show that the Mitigation Plan will affect only an additional 3.6% of inland water, an arguably insignificant increase. It is not immediately apparent which figure would be more relevant.

**20.** Appellees assert that the record does not support this conclusion but rather shows that issuance of the permit was forthcoming regardless of the Mitigation Plan and based solely on a study by a Mr. Macomber, opining that the wetlands at issue here are a "biological desert." We reject this argument. The record shows that at least a combination of the effect of the Macomber report and the Mitigation Plan led to the decision and that but for the Mitigation Plan approval would not have been granted.

cluding that the plan itself would not have adverse effects on water quality.[21]

Given the plan's detailed proposals for mitigating any adverse environmental effects resulting from the creation of Lake Alma, as well as the role of the plan in allaying the environmental concerns of all relevant federal agencies, we conclude that the Mitigation Plan will have a significant qualitative environmental impact.[22] The conclusion of Alma officials to the contrary is not reasonable and the district court's approval of that conclusion is clearly erroneous.

V. § 404 Permits for the Green Tree Reservoirs

■ Appellants argue finally that the Corps acted improperly in issuing the § 404 permit for Lake Alma without first requiring application for § 404 permits required for the construction of the GTRs. The § 404 permit granted for Lake Alma expressly is conditioned on construction of six GTRs. These GTRs will require their own dams, which, appellants argue, will require individual § 404 permits. Appellants contend, therefore, that Lake Alma cannot lawfully be constructed unless the permits for the GTRs are first applied for and issued.

The district court found appellants' argument logically appealing but held that appellants had the burden of proving that the GTRs will require separate permits. Since the precise location of the GTRs is not yet definite, the court concluded that appellants had failed to meet this burden, and therefore issuance of the Lake Alma permit prior to consideration of the need for GTR permits was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. We disagree.

Issuance of a permit before engaging in a determination of the need for the GTR permits would allow Lake Alma to be constructed even though at a later date it is determined that additional § 404 permits are needed and cannot be obtained. Lake Alma, the environmental soundness of which is conditioned on construction of the GTRs, would thus be constructed without the GTRs. For the Corps to act in the face of this open question was a clear error of judgment and thus an abuse of discretion. See Citizens to Protect Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

■ While appellants have the burden of demonstrating an abuse of discretion or arbitrary agency action, this burden is met by showing that there is a substantial issue as to whether or not permits will be required for the GTRs. The district court erred in placing on the appellants the burden of conclusively closing the question.

The Corps' internal procedures require:

All activities which are reasonably related to the same project and for which a Department of the Army permit would be required should be included in the same permit application. The District Engineer should reject, as incomplete, any permit application which fails to comply with this requirement. For example, permit application for a marina shall include dredging required for access as well as any fill associated with construction of the marina.

March 1, 1979, DAEN–CWO–N Directive on Permit Procedures. The parties do not dispute that the GTRs are "reasonably related" to the overall project. The only nonarbitrary reason for not requiring contemporaneous application for the GTR permits would be a conclusive demonstration at this juncture that the permits were not necessary. Such a showing has not been made.

---

**21.** The EPA originally argued that the plan was insufficient to mitigate the environmental impact, but eventually withdrew all objections, explicitly referring to the Mitigation Plan.

**22.** We emphasize that we have no quarrel with the conclusion that the GTRs will cause no impact on water quality. The Mitigation Plan was intended to mitigate the effect of the project on wildlife considerations. It is this significant impact that warrants an SEIS. If there were no significant impact from the plan it would not qualify as a Mitigation Plan at all. We defer to the judgment of the FWS and the Corps that it is indeed a Mitigation Plan.

At best, there is a *possibility* that all of the GTRs could be covered by a nationwide permit, making application for individual permits unnecessary. The district court did not hold to the contrary. The Decision Memorandum of the Corps, recommending issuance of the Lake Alma § 404 permit, indicates that a site inspection was undertaken to determine whether "the green tree reservoirs included in the Mitigation Plan would require a public notice with opportunity for public hearing and would require a 401 [*sic*] water quality certification."

The site inspection revealed that, of the tentative green tree reservoir locations, one (area A–1) was covered by a nationwide permit, that four *could probably* be constructed so as to be covered by a nationwide permit, and that one *would require* an individual permit. Furthermore, the Corps believes that the green tree reservoir acreage required by the Mitigation Plan *could be* satisfied by green tree reservoirs constructed under a nationwide permit by relocating the one reservoir which would now require an individual permit. *The Corps would also require the permitee to apply for any permits that may be required to construct any of the green tree reservoirs.*

Aug. 29, 1980, Decision Memorandum for the Assistant Secretary of the Army (Civil Works), page 3 (emphasis added).

The final word from the Corps, a November 10, 1981, letter from the Corps District Engineer, accompanying the issuance of the draft permit, states: "Based on their final location, construction of the green tree reservoirs *may require* additional Department of Army permits." If, as suggested, any permit applications are required, the Corps' procedures for consolidated permit application, including public comment, must be followed before the Lake Alma permit, which is conditioned on construction of the GTRs, is issued.

Appellees argue, however, that the Corps has developed a policy of imposing mitigation plans, and determining whether permits are necessary therefor, as conditions *subsequent* to issuance of permits for the entire project. As evidence of this policy, they refer to a statement of the Corps' internal procedures which authorizes a district engineer to condition the issuance of a permit on the implementation of a proposed mitigation plan.[23] Appellants argue that we are prohibited under *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.,* 435 U.S. 519, 543–44, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978),[24] from interfering with this "established" procedure.

Neither the record nor the findings of the district court support appellees' interpretation of Corps policy. On the contrary, this case presents a unique situation. As stated by the Deputy Assistant Administrator for Water Planning Standards of the EPA in July of 1979:

> To the best of our knowledge, this is the first case to come to the attention of this office in which a proposed mitigation feature of a project itself would require a Section 404 analysis. We wanted to alert you to this problem at this time, early in the process, in the interest of avoiding

**23.** Appellees rely on the following statement of internal Corps procedure:

> Mitigating environmental measures suggested by Federal or state agencies with responsibility for assessing the environmental impact of the activity covered by the permit may be considered by the district engineer. The discretionary authority of the district engineer to so condition permits to effect mitigation is set forth in DAENO–CWO–N letter dated 13 February 1978.

March 1, 1979, DAEN–CWO–N Directive on Permit Procedures.

**24.** In *Vermont Yankee* the Court stated: "Absent constitutional constraints or extremely compelling circumstances the 'administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." ' " 435 U.S. at 543, 98 S.Ct. at 1211 (quoting *FCC v. Schreiber,* 381 U.S. 279, 290, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965) (quoting *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed.2d 656 (1940))).

unnecessary delays in the further processing of this important case.[25]

Given the indication that this is the first case of its kind and the absence of any support in the record for the notion that the Corps has developed a consistent condition subsequent procedure, we reject appellees' argument. As quoted *supra,* the Corps' usual procedure is to require all related permit applications to be submitted together. Although the Corps does have a procedure for conditioning permits on implementation of a mitigation plan, the memorandum describing that procedure does not purport to modify the general policy pertaining to permits for related activities. It does not discuss the procedure for review of permits that may be necessary for the mitigation plan itself. It certainly does not state that the necessary mitigation plan permits could be obtained at a date after approval of the initial permit. Such a policy would be directly contrary to the usual procedure of requiring contemporaneous permit application of all related project activities. In the absence of a stated policy to the contrary, the Corps' normal procedure should be followed. This may be an unusual case, but that is no reason to abandon the well-settled internal Corps' policy of consolidated permit application.

The applicable procedure established by the Corps within the meaning of *Vermont Yankee* is one of contemporaneous application for all required permits. We impose no additional procedural requirement here. Because the locations of the GTRs have not been determined, the district court concluded prematurely that no § 404 permits would be necessary. If the GTRs will not be covered by a nationwide permit, Corps procedure requires it to review and approve individual permit applications before issuance of the overall project permit.[26] Statements by the Corps itself indicate a substantial likelihood that appellants will prevail in establishing a need for additional

§ 404 permits. The district court erred in deciding otherwise in the face of this open question. We therefore remand to enable the district court to decide, once the GTR locations are determined, whether additional permits are necessary.

## VI. *Conclusion*

▮ The district court erred in concluding that appellants had shown no likelihood of success on the merits. Appellants have made a sufficient showing on the need for an SEIS and the impropriety of issuing the § 404 permit prior to a determination of the need for additional permits for the GTRs.

Appellants also have carried their burden as to the other requirements for preliminary injunctive relief. Irreparable injury is readily apparent. Absent injunctive relief, the funds in question will be expended, the wetlands will be destroyed, and those appellants who are landowners will lose their land. Issuance of the injunction may cause monetary injury to the appellees. Failure to grant the injunction, however, will cause irreparable injury to the appellants which outweighs the threatened harm to the appellees. Issuance of the injunction will serve the public interest, given the substantial issues involved both as to the proper use of federal funds and protection of the environment.

Hence, the preliminary injunction is granted and this matter is remanded to the district court for further proceedings. AFFIRMED IN PART, REVERSED IN PART and REMANDED.

JOHNSON, Circuit Judge, concurring in part and dissenting in part:

I concur in all of the opinion of the majority except Sections II and III. I dissent from Sections II and III. I do not believe that the officials of the Department of

---

**25.** Plaintiffs'/Appellants' Exhibit 16, page 2.

**26.** Appellees argue that they could not have complied with this procedure given that the Mitigation Plan was not adopted until after the original permit application had been filed. Consistent with established procedure, however, appellees are free to amend their permit application to include the Mitigation Plan if the Corps concludes that permits for the GTRs will be necessary.

Housing and Urban Development had the authority to waive the principal benefit regulation of the governing statute, 42 U.S.C.A. §§ 5301–5320, and authorize the release of public funds for a project that it had found would not principally benefit low-and moderate-income persons.

If the requirement that a Community Development Block Grant principally benefit low-and moderate-income persons is a statutory requirement, HUD has no authority to waive it. If the requirement is merely regulatory, then HUD may waive the requirement "whenever it is determined that undue hardship will result from applying the requirement and where application of the requirement would adversely affect the purposes of the Act." 24 C.F.R. § 570.-4.

In concluding that the "principal benefit" requirement was regulatory only, the district court deferred to the agency. The court concluded that the agency's position was reasonable because it was consistent with the language of the statute. The court acknowledged that the "primary objective" of the statute was to principally benefit low-and moderate-income persons, 42 U.S.C.A. § 5301(c), but the court deferred to the agency's argument that the only statutory *requirement* is that the project have "been developed so as to give maximum feasible priority to activities which will benefit low-and moderate-income families." 42 U.S.C.A. § 5304(b)(3). I cannot agree with the majority's affirmance of that part of the district court's action.

In order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose. *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974). HUD's interpretation of this statute is not entitled to deference because it is clearly contrary to the purpose of the statute. In fact, there is no support in the legislative history of the statute for a project such as this one. HUD's interpretation of this statute would permit funding of a luxury condominium as long as it benefits low-and moderate-income

persons to the maximum extent feasible. Conceivably, under this interpretation the luxury condominium that would enhance the skyline for the low-and moderate-income persons would be the benefit "to the maximum extent feasible." Appellants on the other hand assert that to be funded a project must *at a minimum* principally benefit low-and moderate-income families. Apparently, this requirement was not expressed as a requirement because the drafters of the statute did not think it was necessary—it was stated as the "primary objective" of the statute. The statute then explicitly requires the Secretary of HUD to determine that low-and moderate-income persons benefit to the maximum extent feasible. 42 U.S.C.A. § 5304(b)(3).

When 42 U.S.C.A. § 5304(b) was being drafted, the Senate bill contained a provision prohibiting more than 20% of an applicant's community development funds to be used for activities which do not directly and significantly benefit low-and moderate-income families or blighted areas. Conf.Rep. No. 93–1279, *reprinted in* 1974 U.S.Code Cong. & Ad.News at 4453. There was no question that low-and moderate-income persons were to principally benefit. In order to permit more flexibility with funds, the conference report replaced the Senate provision with a "maximum feasible priority" requirement. *Id.*

When the 1977 amendments to the statute were added, the House Conference Report stated:

*Application disapproval*

The Senate amendment contained a provision not included in the House bill which provided for the disapproval of block grant applications which do not comply with the requirements of the block grant program and specifically with the primary purpose that the program principally benefit persons of low-and moderate-income. The conference report contains the Senate provision amended *to specifically incorporate the present law requirements that no application be approved unless it:* (1) aids in the prevention or elimination of slums and blight,

(2) *principally benefits persons of low-and moderate-income,* or (3) meets a need of particular urgency. (emphasis supplied). Conf.Rep. No. 95–634, *reprinted in* 1977 U.S.Code Cong. & Ad.News at 2965.

Given the fact that the House Conference explicitly refers to "the present law requirement" that an application must principally benefit persons of low-and moderate-income, it is clear that HUD could not waive this *statutory* requirement. Even if this requirement were only regulatory, under 42 C.F.R. § 570.4 it could not be waived. Waiver would be contrary to the purposes of the Act. The waiver action by HUD is, in my judgment, completely contrary to what Congress intended and this Court should not put its stamp of approval upon such action.

I DISSENT from Sections II and III of the majority's opinion. I CONCUR in the remaining portions of the opinion.